I'm here before the court today on an appeal of a bench trial, following a bench trial in the Eastern District of Virginia before the Honorable District Judge Jackson, in which the court found appropriately that U.S. law, that it had subject matter jurisdiction to U.S. law to that question, but then made two errors in findings, which we asked this Court of Appeals to reverse. And I'll be breaking them up into two sections because one deals with an issue of fact with respect to how the lien claim came about, which was the question of authority to order the bunkers in question, which was the maritime fuel provided to the Lila Shanghai. And then the second part of my time I'll use to discuss the court's improper application of the latches defense in order to dismiss the case on a basis of the equitable grounds of latches. Here there's a few things that are not in dispute in this case. The first is that Sing Fuels Pte Ltd. received an order for approximately a thousand metric tons of fuel to be delivered in Port Elizabeth in South Africa in July of 2019. It's also not disputed that those approximate value of the bunkers which were provided at the time is reflected in the undisputed invoice of $532,000, give or take. Those bunkers have never been paid for by any party. The plaintiff paid the physical supplier in South Africa. The bunkers were received by the master and chief engineer and it's undisputed in evidence in this case that the bunkers were consumed by the vessel on board in completing its journey and trade. Let me just ask you one question here. I appreciate what you said. The whole question boiled down to the matter of agency and why do you say that Mr. Malinakis, what's your strongest case for saying that he really was an agent of the charter? Yes, your honor. A few points on that. With respect to and first of all, we start from a point of law which is that there's a presumption that the charters and their agents have the authority to order necessaries for a vessel. Mr. Malinakis represented two sink fuels that he was that point of contact on behalf of Medmar. The owners of the vessel... What's the evidence of that? Where's that in the record? It's in the record. Plaintiff's corporate representative testified that that was the representation in the course of dealing from Mr. Malinakis. Now, point taken that if plaintiff was simply relying on actual authority, the court might look for some sort of confirmation from Medmar Inc. However, that's not for the purposes of maritime law with an apparent authority. All that there has to show, while we can't rely solely on plaintiff's subjective belief, it's not a subjective belief. You have a manifestation of the principal's intention. You have the Medmar Inc. asking the vessel's captain what the amount of bunkers are on board, what the speed it's going to take to get to South Africa, whether the vessel can complete the voyage from South America to India on the bunkers currently on board. And it's undisputed in this record and also undisputed as a matter of admiralty law that charters on a time charter have responsibility for bunkers. That was admitted by the corporate representative on behalf of owners and made evidence in this case. They had every expectation that Medmar would arrange for the bunkers. So the district court in this case concluded that Mr. Malinakis actually ordered, at least the evidence suggested, that he ordered the bunkers not for Medmar but for Mack shipping. And so I'd ask you to talk about that because there does appear to be evidence to suggest that that's the case. And we'd have to find that that finding was clearly erroneous in order to overturn it. Right, but there is some documentation in the which suggests that Mack shipping had some level of involvement. But what I would urge the court is that we don't actually have to get to the specifics of the contractual relationships between a charter and its agents. I mean that was cited in our briefs that that is the case law as a matter of lien law. And one of the things that I'd like to point out to the court with respect to why there was apparent authority by the actions of the vessel and why that matters here is because a vessel master wears two hats. He's obviously owner's agent, but he's also the charter's agent when it comes to charter's obligations, including the obligation for fuel, which is undisputed that fell to Medmar. The exact amount of bunkers that Medmar called for to be provided to the vessel in order to complete the voyage to India is exactly what our client provided and the master and chief engineer accepted in Port Elizabeth, South Africa. So I thought that you're in trying to find out who Milonakis was the agent for. You say he was the agent for Medmar and I thought that the evidence you relied on was a reference to the previous transactions, where the previous transactions had gone through Mr. Milonakis and they were sort of a reference to Medmar. But in each case, they were paid for and it's hard to conceive of who else would have paid for them if it wasn't Medmar. I mean, I thought that was what you were driving at, is that correct? That we do raise that as well, Your Honor. And in fact, there were eight other supplies, all of which were paid, all of which were to other vessels in which Medmar, Inc. was the charter. They are charters, that is their business. And so, including the immediate preceding supply, which occurred in May of 2019. Milonakis was the agent in those cases. Who was it? Is that correct? It was the point of contact as the brokerage between Medmar and Singfuels in Singapore, yes. The requests for payment were made to him? The requests to payment were addressed to Medmar, Inc., but they were passed through his email, yes, as the point of contact. Not dissimilar to the very charter parties in this case, and the communications back and forth between owners and charters Bostomar and the charters Bostomar and the subcharters Medmar, it is common in the industry, in the maritime industry, for communications to be passed through brokers. And parties are not, there is a, both a presumption and a need to be able to rely on those representations for the, at the very heart of the business of shipping and for vessels to be able to go from place to place without a supplier of goods or necessaries having the obligation to investigate each and every party's authority to engage. So, just so I understand your position here, is the representation that you assert existed in this case the result of the direct statement made by Mr. Malinakis or someone that indicated that he, in fact, was the agent for Medmar for this transaction? Because, I mean, you have to sort of take each transaction on its own set of facts, right? Correct. But it is all three, right? It's a small industry. We're talking, we're not talking about large groups of people. We have Mr. Malinakis, on the one hand, who says he represents Medmar Inc. That was, that representation was made to plaintiff's representative and employee. With respect to the earlier transactions? With respect to the earlier transactions and with respect to this transaction. That was the course of dealing that they had. That apparent authority to act on their behalf was confirmed by the fact that the exact amount of bunkers that this charterer was tasked with supplying to this vessel and needed and ordered showed up in South Africa on the date when it was intended to be there and was accepted by the master and the chief engineer. These things do not happen in a vacuum or by accident. And there's no evidence in this record, contrary to the other cases that Judge which say, oh, well, if there's a broker in the chain or some other party that doesn't have authority, then that breaks the right to incur lien against the vessel. So what do you say was Max Shipping's role in this, if any? It's unclear that they had any role with respect to this. As the evidence came in, it appears that Max Shipping is a paying agent or some other related entity of Medmar Shipping Inc. They are not an independent party. They're not some other company that is engaged in the business of buying and selling fuel for the purposes of defeating liens. At best, they are another agent of Medmar Inc. But the case of Belcherco that we cited from the Fifth Circuit and several other courts which have looked at this have said that it's not the supplier's obligation to understand the exact relationships between these parties. If there is a manifestation by the principal that demonstrates that they actually wanted this supply to come to the vessel from these suppliers, and that absolutely occurred here. I notice I have limited time. I would like to address the laches issue. With respect, before you address the laches issue, is there any alternative in your view, any kind of plausible alternative for the course of dealing and payment here? I mean, Malinakis, a well-known fuel broker in Athens, who arranged, you say, who arranged this sale, and he'd arranged a good, just try to get my own understanding, I'm not sure. He had arranged sales in the past, eight previous transactions on behalf of Medmar. So, I'm trying to find out what the evidence was that Malinakis could have been acting in some capacity than as an agent for Medmar. Your Honor, that's an excellent point. There is no other evidence that he was acting in any other role. There's no, unlike the cases that are cited where there is a clear cutoff for a broker, those are entities that are buying and selling fuel as a trader or some sort of other party. Here, Mr. Malinakis, there's no other invoices, there's no other payments, everything was passed through to Medmar. The question you raise is whose duty is it to untangle the relationship between the agent and the charter? And your point is, given the past history of dealings, that it was reasonable for these folks to think that Malinakis was acting as an agent as he had, as a broker, as he had in the past. And I want to hear what the other side says about this. But I gather a lot of your position rests on the importance of maritime liens and the whole business of supplying bunker fuel. And that you made a perfectly reasonable assumption, and I'm just trying to understand your position, that you made a perfectly reasonable assumption based on all your past dealings, that Malinakis was arranging the sale on behalf of Medmar. Is that it? Yes. Let me ask you, why did you produce documentation that would show these prior representations of the testimony? It has to be some kind of documentation. Um, yes, your honor, it just, it ended up being a question that came up at trial, as opposed to, and part of that reason is because of the historic presumption in U.S. admiralty law that charters and their agents have the authority to bind a vessel. So it wasn't, it was something that came up at trial and was answered by the witnesses, and that was the way that the evidence was marshaled in. But yes, that documentation does exist, it's just unfortunately not part of this record below. Well as to your latches argument, if we find that you don't have a maritime lien, we don't have to reach that question, but if we do, I assume your position is that it was an abuse of discretion in applying the doctrine. Yes, your honor, there's a lot more to it. Um, I know that I'm out of time, but you're not incorrect, right? Latches is a defense. Judge Floyd has asked you a question now. Yep. I'd like you, we're going to give you the time to respond to Judge Floyd's question, but he's got, he has a question now. It's a good question, I want to see what you say. A two-part answer. The first part is absolutely correct. If you find that there's no maritime lien here, you don't have to get to the equitable latches defense. With respect to latches, two of the Fourth Circuit's cases that are historic and I think provide some important guidance when you look at the underlying facts of those cases, and they were cited by all the parties, they were cited by the district court, but it's the application that was erroneous here. The Celia Ann, in that case, the Fourth Circuit said that we got to look at the peculiar equitable circumstances of the case. That case involved an innocent purchaser of a vessel more than two years after the services had been provided to the vessel and the arrest was not even commenced until seven months after that transaction had occurred. Here, you have the same owners of the bunkers three weeks after the supply. So, completely different circumstances. And then the Giddey's case, which was a personal injury case, but I think has a lot of important information with respect to how this circuit looks at and treats latches. There, the court had applied a two-year statute of limitations on a personal injury looking to the analogous Virginia statute, and the Fourth Circuit said, no, we're not going to hold it that stringent. We're going to look at an analogous maritime statute. They looked at the Jones Act, said that three years was enough. But importantly, in explaining how we look at whether or not there was undue delay or whether or not there was unfair prejudice, the court explained that that second prejudice contemplates the dispersal and inaccessibility of witnesses, the dimming of recollections, and other disadvantages incident to the lapse of time. Here, you had immediate notice, and not only did you have immediate notice, but you have a owner who has not been prejudiced. The owners had the opportunity. The vessel was still on charter to Boston Mar. They had the opportunity before the vessel was redelivered to, in their final statement of account, work out some sort of either agreement for security. And in fact, they still haven't been prejudiced because if this court reverses, as it should, holds that there is a maritime lien and enforces against the security, what will owners do? Well, they'll commence an arbitration against their charters that allowed the vessel to suffer a maritime lien, despite an obligation under the charter party that they were not supposed to allow that to happen. All right. Thank you. Judge Boyd, do you have anything you'd like to ask? Yes. No, I don't have any other questions. Judge Diaz, do you have anything further you wish to ask Mr. Sparkman? I don't. Thank you, Judge Boyd. All right. Let's hear from the other side here. I'd be interested to hear what Mr. Paul has to say. Good morning, and if it pleases the court, I'm Dustin Paul on behalf of the claimant in this case, Autumn Harvest, and the defendant, Vessel. I'm a partner at Van Evener Black. My colleague and partner, Ed Powers, was on the brief with me, and we're pleased to be here today in person arguing before the Fourth Circuit. It's a pleasure to be here physically. I know this still is a little different than it was classically. The last one I had of these was virtual, and I got to tell you, I like being here in person a lot more. This case went to a trial before Judge Jackson and had a lot of complicated issues before Judge Jackson about maritime liens, a lot of factual scenarios, discussions about U.S. law I think we can address it on fairly pedestrian grounds because it really boils down to the standards of review that this court deals with every day. We have two independent bases by Judge Jackson in which he ruled in my client's favor. The first is the agency issue we've already talked about, which is subject to a clear air review, and then we've also got the laches issue, which is subject to an abuse of discretion. So the heights that my colleague has to reach to overturn those decisions after a trial on the merits where Judge Jackson heard the evidence, got to interact with the witnesses, got to review all this, is substantially high for a reason. How long was the trial? One day, Your Honor. One day, okay. I'd like to start with you. Let me just ask you, it troubles me that the plaintiff here provided the bunker fuel and that they've never been paid. And given the supply, the problems that we have with the supply chain, the whole presumption of maritime law is that maritime liens would be readily available to those who supplied bunker fuel. And the reason for that is to keep the ship going. And you want to encourage as a fundamental matter that those who provide bunker fuel for the supply chain in this country and around the world get paid. And that is just a troubling feature to begin with. And I just would like to know what your thoughts about this are. It's a difficult case, close case, but I'd like to know what your view is. Let me address that issue for you, Your Honor. I think the first place I'd start with is the recognition that the idea that you need a maritime lien in order for fuel to be supplied to a vessel is largely a uniquely U.S. perspective. Most of the world operates without the existence of this lien at all. So the idea that the lien has to be in place for a transaction like this that occurred in South Africa between a Singapore company and a Greece charter, I don't think it's necessary to conclude that that lien has to exist. But your larger issue is, is SingFuel, I think, is SingFuel just an innocent bystander who couldn't have done anything to protect themselves? And the answer is no. There was an easy solution to this, and that was to require this purported agent, Mr. Milankas, to have his principal sign the order confirmation. In fact, if you'll look specifically into the record, that's exactly what SingFuel's asked for. And they sent him a specific notation that asked him to have that signed. And he couldn't do it. Is that an obligation of the supplier of the bunker fuel to go back into the relationship between the charterer and the owner or between an alleged agent and the charterer? I mean, there are a lot of background relationships, both between the agent and the charterer and the charterer and the real owner. And to what degree is it the burden on the supplier to go back in and decipher those contracts if it has a reasonable basis for believing Milankas was the agent? Well, it's their obligation to determine that if they want to rely upon a U.S. statute which says that the lien is only available to the agents of the or the hope that he was the agent and conduct a commercial transaction for half a million dollars without any due diligence to find out who he was and who he was working for, that's certainly their perspective from a commercial standpoint. They can do that. But if they want to rely upon U.S. lien law, they've got to establish that he was the agent of the charterer. And I'll tell you, as Judge Jackson concluded, there was no evidence of that at all in this case. Well, let me ask you this. Who else would he have been the agent for if it Well, it's clear from the record that he never had any communications at all at any point with Medmar. So he's a purported agent who has never talked to his principal. We know that he works for a company called Windrose Marine. We know that he never communicated directly with Medmar. He was dealing with some company called Mack Shippey. And the problem is we have no idea what those relationships are because despite naming Mr. Milankas as a witness who would appear at trial and testify on their behalf, and you can look at the final pretrial order for that where he's listed as a witness for SingFuels, he never appeared. So all of these questions... What evidence did SingFuel proffer as to previous transactions? That seems to be an issue in this case. There was testimony without any documentary support by their witness that said there was eight previous transactions with Mr. Milankas. And they knew he was an agent for one and only one reason, because they had been paid for the previous transactions. But as Judge Jackson acknowledges in his opinion, and as the testimony was clear at trial, there was not a bit of evidence as to where that payment came from. I think it's important for the court to realize that there's two sort of different alternatives that could exist here. Who else would he have been the agent for if it was not for Medmar? Well, Your Honor, as we describe in our brief and as a lot of the cases talk about, these fuel transactions often happen in a series of back-to-back transactions. So the charter has his choice of who it wants to contract with. There may be any reasons why it wants to contract with a given party, given payment terms, price, or any other specific terms, and they reach an agreement for that fuel to be supplied. But if you have eight previous transactions which have gone through, or a large number, which have gone through Milankas, and they're routed through Milankas, and in each case, the bunker fuel was paid for. And so why wouldn't that, it's not just one or two, it's a long pattern of prior transactions where the payment was to Milankas, and in turn, Milankas was paid for that. And why wouldn't it be fair, given the emphasis that maritime law puts on suppliers of bunker fuel being paid? Why wouldn't it be reasonable to go that route? Because nothing in the previous transactions indicated any direct relationship with Medmar. And in fact, if that would have happened, if we would have had the actual testimony at trial, this would be a difficult case. And I ask, and Judge Jackson listened and put in his opinion, we specifically asked the witness, what evidence did you have that it was Medmar that was involved in these transactions? So who was Milankas an agent for, if not for Medmar? I think it's very difficult. What evidence do you have for that? Your opponent says max shipping wasn't in the case. But they were not in the case. Perhaps they should have been a part of the case. The problem was the absence of evidence from the plaintiff in this case. They had the opportunity to call Mr. Milankas. Again, he was listed as a witness, and we could have solved a lot of these questions and determined this. They chose not to call him, I would suggest, because his testimony would not have been helpful to them. We don't know what happened in this case. The burden is on them to demonstrate this agency relationship to fall under the statute. They can't do it, relying upon these previous transactions that have no apparent connection to Medmar. If they had come in with the wiring instructions and shown that, yes, in fact, these previous eight payments had come from Medmar, that Medmar knew they existed. Remember, if you'll read Judge Jackson's opinion, one of the things he relies upon, in addition to the testifying, in addition to the absence of the signed receipt that they were requested for, in addition to the concession that they never had a conversation between Mr. Milankas and Medmar, is that Mr. Spartan's client tried to go talk to Medmar about these bunkers, and they wouldn't even talk to him, because his client was a stranger to them. They were somewhere farther down in that contractual chain. Medmar had contracted with somebody else, and I can't tell you who that is, because Sengfuels didn't do any diligence or investigation and presented no evidence of trial. But what I can tell you is there is no evidence which establishes a relationship between Mr. Milankas and Medmar. And, in fact, we've got the testimony from Sengfuels in which they admitted that they learned Mr. Milankas never had a single conversation, any communication with his purported principal. The burden is on them to prove the agency, and we're at a clear air standard here. They simply can't overcome those problems in the case below. What should they have done with the bunker fuel, in your view? What should they have done with the bunker fuel? They should have, of course... They delivered it to Port Elizabeth. Whatever, what do you say they should have done? I think the clearest thing and the easiest thing they could have done is followed through on their own request and made sure Mr. Milankas could obtain a sign and stamp confirmation from Medmar indicating that it was actually Medmar they were transacting with. If they would have done that, this case would be over. They didn't do that because Medmar had no relationship directly to this transaction. They had contracted with somebody else who we don't know who that is. You've got a principal here who's never, sorry, an agent who's never talked to his principal who's had a simple request made of him. Get this signed by your principal and then we'll move forward. He can't do that and they move forward anyway. They took that risk. My client certainly didn't take that risk. My client is an innocent owner of this vessel who had no involvement in this transaction at all. If they want to solve these problems, it's easy. They do it on the front end. They ensure that the person they're dealing with is actually an agent or they call them to testify at trial to establish what the agency relationship was. There was none of that in this case. They can't meet that burden to demonstrate he's an agent. If they can't meet that burden, they don't have a lien. Certainly, on appellate review of a factual finding of Judge that he was wrong on this issue. If the burden is on the plaintiff to nail down evidence that this individual, that Milanakis, was in fact an agent for Medmar and the plaintiff has that burden, how does that sit with the general presumptions of maritime law that you want a maritime lien to be readily available to suppliers of bunker fuel? Do we establish disincentives? I mean, how does the maritime admiralty law has a basic presumption that suppliers of bunker fuels be paid? How does your view of the case square with that presumption? A couple of things, Your Honor. First off, I'd point out the actual supplier of the bunker fuel was paid. Sink Fuels didn't deliver any fuel directly to this vessel. It was done by a different company, Addict Energy. You can see that. It's one of the few exhibits that were presented at trial. There's a physical supplier who's providing it to the vessel, and nobody claims they've got a maritime lien because the maritime lien only exists, and this has been clear in the law. It only exists with the party who's actually contracting with the charter. So the fundamental question is, who is the charter contracting with? And we don't have that evidence in this case. But to address your issue, it's still easy. It's still easy to get the lien. All you've got to do on the front end of this process is make sure you know who you're dealing with. Instead, they took the representation of this one individual who claimed he was working for somebody without any support of that, who couldn't produce any documentation, who admitted he'd never talked to his purported principal, who couldn't get a signed invoice despite the fact that was requested at the very beginning. There's no overarching inherent problem in this going forward. The only thing is that fuel suppliers like St. Fuels have to do just a little bit of diligence to make sure they know who they're talking with. And if Your Honor will allow me, I'll touch briefly on the Latches issue with my remaining five minutes, because that's the alternative ground, that even if you have some concerns about applying a clear air standard to the findings of Judge Jackson, Latches solves that problem. We can determine the case on that alternative ground. There's been no actual criticism of the process Judge Jackson followed in this case to apply Latches. He did exactly what this court has told him to do. He was tasked with determining what the most analogous state law statute was to a maritime lien. He had one proposal in front of it. It was our proposal that it was Virginia's lien law that concerns real state. St. Fuels presented no other alternative statutes, and in fact told him below and told you in the brief below that using that Virginia six-month statute could be done as a benchmark. So they've conceded that that's an inappropriate benchmark, and they haven't offered below or here any alternatives. Applying the six-month limitation, it's clear they didn't file the claim within six months. Judge Jackson tried to get out of them what the excuse was, what was the reason for the We decided not to arrest in a series of other ports within that six-month period because we wanted to wait and see if we could work out a commercial solution. That's fine, but that's not an excuse for delay. The courts acknowledge that that's not an excuse for delay. So we see that they're past that six-month process, and it's undisputed. They waited more than six months. So then the presumption... Can I ask a question about that? You say that they could have arrested the ship in some other ports, but what's the evidence or the analysis suggesting that those ports and those countries actually would have recognized a maritime lien? It was admitted by their witness at trial, and Judge Jackson cites that testimony within his... There were a couple of examples, one being the United Kingdom, I think was one possible port, and maybe Dubai, but as I understand it, neither one of those countries recognizes maritime liens. They were capable of arresting that vessel in those jurisdictions and just chose not to. I agree. Had there been a contest where we went in and argued about the possibility of these ports being appropriate or not appropriate, that evidence might have shaken out in some different ways, and we'd have to weigh that evidence, but there was none of that because there was a concession by SingFuel's corporate representative who testified at trial that they were capable of arresting and enforcing the lien in other jurisdictions. So that's an admission. Now, there was some other evidence, I guess, from the other side that part of the delay was the hope that they would be able to negotiate a resolution short of arresting the vessel, and that on the surface sounds reasonable to me. Why is that not a sufficient reason for why latches shouldn't apply in this case? Because that's... Because the courts, and we cite to the Second Circuit who specifically talked about that, said that it's not appropriate to delay arresting procedures in the hopes that you can work out a commercial solution. They've got the time period. They've got the clock running. They've got to make that decision, and the choice to not arrest because you think you can reach a commercial solution isn't recognized as a reason to delay past the rule of thumb. So can I go back to this issue of agency? So... And this, I guess, is part of Judge Wilkinson's concern, and perhaps the court's concern is, so what exactly was Mr. Molonakis's role in this case? Somebody was working on behalf of the, you know, the charter, right? I believe... There is no doubt the charter at some point ordered fuel for this vessel. I mean, I think that's acknowledged. That's who's supposed to order the fuel. That's who ordered the fuel. The question is who they ordered the fuel from, and we don't know because the plaintiff chose to not present the testify. We don't know who they ordered that fuel from. What we do know is Mr. Molonakis was not an agent of Medmar because he'd never talked to Medmar. He had no documentation with Medmar. He had nothing showing his agency. When they went to go talk to Medmar about this, Medmar wouldn't even... Isn't the question whether there was a reasonable assumption on the part of the plaintiff here that the agent, if you put too much of a burden on fuel suppliers, they're going to be more reluctant to supply fuel. There's a different problem also here of establishing a shell game. It just troubles me that they've supplied all this and they haven't been paid for it, and it was their supply of fuel that allowed the vessel to continue on its way. Your Honor, didn't they have relief against Mr. Molonakis? They have relief against Medmar if that's actually who they contracted with, but what they don't have is relief under the U.S. law because they can't It's not the vessel who's responsible in this situation. I'm just wondering how much of a burden maritime law puts on a plaintiff like this who supplies the fuel in order to secure a maritime lien. I'm worried about making that burden too high and exercising a chilling effect on the provision of bunker fuel, which is necessary for the whole system to work. I understand your position early, which is he should have taken some steps to find out who he was dealing with, and in an ordinary context, that's true. I'm wondering to what degree that carries over to the admiralty context where you have a whole different set of concerns, the chief of which being the free flow fuel that enables cargo to move. If we're putting burdens on the plaintiff and we're playing a shell game before you can get paid, that concerns me. You make a fair point. I understand the point. I'm just wondering how it relates to the regulations that undergird maritime and admiralty law. I know I'm over my time, if I can respond. Go ahead, sure. I guess I would answer in a number of ways. First, I'd start off with Mr. Sparkman has not cited, and I know of no cases, which suggest that the rules for agency under maritime law are different than the common law agency rules. In fact, I can cite at least one case to the contrary. I'm talking about the presumptions in allowing suppliers of fuel to obtain a maritime lien. Those presumptions only apply when you demonstrate that it was an agent of the charter. It's a preliminary step to that. The presumption doesn't come into effect here because they can't demonstrate his agency. To me, at least, it's not a high burden to demonstrate the agency. All you have to do is get some manifestation from the principal that he's actually the agent. That's what's missing in this case, and that's what we expect in every other agency case, is the principal. You either have to have actual agency where the principal's actually agreed to it, in which case you'd see documentation, you'd see writing, you'd see communications, or a parent authority in which the principal has done something that indicates, yes, this is my agent. But neither of those is present here. There's nothing from indicating they have any idea who Mr. Malonkis is. And Mr. Malonkis himself, and I think this alone is enough to sustain Judge Shaxs' opinion, the testimony at trial from their own corporate representative was Mr. Malonkis had never had a conversation or any communications with MedMart. You can't have an agent who's never communicated with his principal and have that be such clear air that we're going to overturn Judge Shaxs' decision after a bench trial. And for those reasons, I'd ask you that you affirm the judgment. All right, thank you very much. I do have some rebuttal time here, Mr. Sparkman. I'll just start off by saying that Mr. Pauls made a very forceful argument that you didn't put together your case, and that all that was involved was a very simple inquiry of, I would guess, either Malonkis or MedMart, and that a communication with either one of those could have clarified the issue of agency. And you didn't make those inquiries. And so they're saying, you know, you didn't have your stuff together when you sued for payment on the bunker fuel, and it would have been very easy to have established the agency relationship. I'm going to ask the courtroom deputy, Dr. Clark. I don't, I saw it, see it. Thank you very much. All right, go ahead, Mr. Sparkman. Thank you, Your Honor. The manifestation of the apparent authority in order to arrange for these bunkers to be supplied to this vessel was confirmed by the Charter's agent, the master of the vessel, in receiving these bunkers. What the court correctly has pointed out with respect to the presumptions under maritime law and this risk of a shell game, there was no direct testimony that owners, that plaintiffs knew for a fact that Mr. Malonkis had no such authority. When it was posed to them what his communications were with MedMart, plaintiffs answered truthfully that they were unaware of what those were. What makes your presumption of an agency relationship in the absence of sort of direct documentation, what makes your presumption of an agency relationship a reasonable one? It's a reasonable one because there was no one else that was ordering or tasked with supplying bunkers to this vessel. The owner's own corporate representative admitted that MedMart was the party who was tasked with arranging for the bunkers. The bunkers were arranged by MedMart through Mr. Malonkis. There is no, there's no case law and there's no facts that have been cited which put the obligation or the burden on Sink Fuels to understand the various interconnected relationship. Every single case in which a court has held, oh there's no lien because the bunkers were ordered by some party without authority to incur a lien on the vessel, there was some other intermediary contract, right? There was a fuel supplier or a fuel trader or a fuel broker or another third party which contracted with the supplier that was attempting to enforce the lien and there was a break in the chain. Here there's only ever been one invoice. Do you have a breach of contract cause of action? Absolutely there's a breach of contract cause of action against MedMart. The reason why that they wouldn't talk with Sink Fuels at the time was because they were out of business. They've gone bankrupt. I mean that's the reality and that's why this was one of those supplies that didn't get, that didn't get solved. Two other quick points that I'd like to address. One, the owner, my esteemed colleague on the other side says that well the physical suppliers were paid so you know there's not that supply chain worry. Yes they were paid by Sink Fuels who paid them pursuant to a contract. So it is Sink Fuels that was out the money for the for these bunkers. The second point that I'd like to just raise quickly. The ability to arrest, and this goes to the latches issue, but the ability to arrest a vessel in a foreign port is not akin to enforcement of or recognition of a maritime lien and the testimony at trial and it's on page 59 and 60 of the trial transcript was that in consultation with counsel the plaintiff chose not to pursue and arrest in those other jurisdictions. So that goes to the issue of whether or not it was an abusive discretion to apply latches here. The vessel was not in the jurisdiction within six months and the the Ryan Day trader case which we cited too says that there's got to, it's not enough to just simply say that there were other opportunities to arrest. It has to be with an akin ability to enforce and that leopard marine case from the second circuit that was my case unfortunately where I came up with the short straw on latches but it was completely different facts. There there had been a delay of four plus years before seeking to arrest the vessel and the court found that that was really sleeping on a right that is just not the case here. All right we've let we've let you go over and we I want to thank both counsel for their interesting arguments in this very interesting case. So thank you, thank you both. I'm sorry we can't come down and and greet you personally but our appreciation remains.
judges: J. Harvie Wilkinson III, Albert Diaz, Henry F. Floyd